# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 83

### APRIL TERM, A.D. 2026

### July 17, 2026

STEVEN RANDALL MARLER,

Appellant
(Defendant),

v.

S-25-0239

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
The Honorable Kerri M. Johnson, Judge

*Representing Appellant:*

Office of the State Public Defender:  Brandon T. Booth, State Public Defender*; Kirk A. Morgan, Chief Appellate Counsel; Patricia L. Bennett, Deputy State Public Defender;   Argument by Ms. Bennett.

*Representing Appellee:*

Keith G. Kautz, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General.  Argument by Ms. Jones.

\* An Order Allowing Withdrawal of Counsel for Brandon T. Booth was entered on July 16, 2026.

*Before BOOMGAARDEN, C.J., GRAY, FENN, JAROSH, and HILL, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]   A jury convicted Steven Randall Marler of eight counts of sexual abuse and six counts of battery involving several of his adopted children and a foster child placed in his care.  Mr. Marler appealed, alleging the district court abused its discretion in various decisions it made regarding the admissibility of evidence.  He also alleges that the State committed prosecutorial misconduct during the direct examination of one of the victims.  Finding no error, we affirm.

## ISSUES

[¶2]   Mr. Marler raises five issues, which we rephrase as:

1. Did the district court abuse its discretion by allowing multiple witnesses to testify to "other acts" evidence under Wyoming Rule of Evidence (W.R.E.) 404(b)?

2. Did the district court abuse its discretion by not allowing defense counsel to question KPM related to an incident of untruthfulness?

3. Did the district court abuse its discretion by not allowing defense counsel to play the entirety of an interview of Mr. Marler during trial?

4. Did the State engage in prosecutorial misconduct by impermissibly eliciting testimony about a victim's father's suicide?

5. Did cumulative error deprive Mr. Marler of a fair trial?

## FACTS

**Background**

[¶3]   Mr. Marler and his wife Kristen Marler fostered dozens of children from 2008-2022 and legally adopted eight children during that time.  The Marlers also have three adult biological children.

[¶4]   In 2016, one of the girls in the Marlers' care, AW, reported sexual abuse, but no charges were filed.  In 2021 another girl, KAM, also reported sexual abuse.  Once again, no charges were filed.  In 2023, a third girl in the Marlers' care, KPM, reported sexual abuse.  Following an investigation, the State charged Mr. Marler with seventeen criminal offenses, detailed in the chart below:

| Count | Crime | Statute | Victim | Allegation |
|-------|-------|---------|--------|------------|
| One | 2nd Degree Sexual Abuse of a Minor | § 6-2-315(a)(iv) | KPM | Marler touched KPM's vagina |
| Two | 3rd Degree Sexual Abuse of a Minor | § 6-2-316(a)(iv) | KPM | Marler rubbed his penis against KPM's buttocks |
| Three | 2nd Degree Sexual Abuse of a Minor | § 6-2-315(a)(iv) | KPM | Marler rubbed and grabbed KPM's chest and rubbed his groin against her buttocks |
| Four | 2nd Degree Sexual Abuse of a Minor | § 6-2-315(a)(iv) | AW | Marler touched AW's vagina |
| Five | 1st Degree Sexual Abuse of a Minor | § 6-2-314(a)(i) and (c)(i) | AW | Marler digitally penetrated AW's vagina |
| Six | 2nd Degree Sexual Abuse of a Minor | § 6-2-315(a)(iv) | KAM | Marler touched KAM's vagina |
| Seven | 3rd Degree Sexual Abuse of a Minor | § 6-2-316(a)(iv) | KAM | Marled laid on, moved against KAM while she was naked |
| Eight | 3rd Degree Sexual Abuse of a Minor | § 6-2-316(a)(iv) | KAM | Marler, while naked, touched KAM "everywhere" |
| Nine | 2nd Degree Sexual Abuse of a Minor | § 6-2-315(a)(iv) | KAM | Marler placed KAM's hand on his penis |
| Ten | 1st Degree Sexual Abuse of a Minor | § 6-2-314(a)(iii) | KAM | Marler put his penis into KAM's vagina |
| Eleven | 3rd Degree Sexual Abuse of a Minor | § 6-2-316(a)(iv) | DW | Marler removed DW's pants |
| Twelve | Battery | § 6-2-501(b) | KOM | Marler punched KOM in the nose |
| Thirteen | Child Endangerment | § 6-4-403(a)(ii) | RFM | Marler kicked RFM off a roof |

| | | | | and did not get him medical attention |
|---|---|---|---|---|
| Fourteen | Battery | § 6-2-501(b) | RDM | Marler rubbed RDM's face in the snow |
| Fifteen | Battery | § 6-2-501(b) | AW | Marler hit AW with a broom |
| Sixteen | Battery | § 6-2-501(b) | KAM | Marler struck and kicked KAM |
| Seventeen | Battery | § 6-2-501(b) | RGM | Marler struck RGM with a rubber strip |

A jury convicted Mr. Marler of fourteen of the seventeen crimes charged.[1]

**Pretrial proceedings and Rule 404(b) rulings.**

[¶5]    Before trial, the State filed four separate notices of its intent to introduce evidence pursuant to Wyoming Rule of Evidence (W.R.E.) 404(b).  In the State's first notice, it stated its intent to introduce evidence that Mr. Marler requested reciprocal massages from the children he referred to as the "daddy tax."  The State argued the "daddy tax" massage evidence was relevant to the sexual abuse charges to show Mr. Marler's motive of sexual gratification, course of conduct, intent to exploit his victims, opportunity to interact with the children without his wife, lack of mistake, and plan or scheme of grooming conduct, "with the ultimate goal of forming a connection and reduction of the child's inhibitions to prepare the child for sexual activity."  The State further argued this evidence was not cumulative because each child would describe their own experience.  In his response Mr. Marler did not dispute that the children gave him massages.  However, he argued the acts of sitting on the girls and giving nude massages with lotion in his bedroom did not happen. He argued this evidence would confuse the jury as to the difference between uncharged touching and the charged conduct.

[¶6]    The second notice explained the State's intent to offer evidence in the form of testimony from the children that Mr. Marler used a series of punishments to "manipulate and control" them, such as spankings with rubber, wood, brooms, and belts that caused welts; excessive exercise; and withholding food.  The State argued the punishments were part of a plan or scheme to ensure silence out of fear and showed a course of conduct.  The State also argued these acts showed Mr. Marler's plan and scheme to commit sexual abuse, as well as his plan to avoid disclosure.  Mr. Marler objected to this evidence, stating it

---

[1] The shaded gray portions of the chart indicate the charges for which the jury acquitted Mr. Marler.

3

lacked a proper purpose, and argued the State had not shown how those punishments were connected to alleged sexual abuse.

[¶7]     In its third notice, the State explained it intended to introduce evidence of uncharged incidents of Mr. Marler touching the children, watching them shower and showering with them, and watching them undress.  The State asserted this evidence was relevant to show course of conduct generally, as well as motive for Mr. Marler's "sexual gratification, his plan and scheme to groom the victims, his pattern of behavior," and to "bolster the victim's credibility."  The State argued these episodes were "necessary preliminaries" to the sexual abuse and intrinsic to the charged crimes.  Further, the evidence served to establish the nature of the relationships, demonstrate grooming, and show motive.  Mr. Marler objected, arguing the events did not happen and the evidence would confuse the jury because they were "crimes that are indistinguishable from the charged conduct."

[¶8]     Finally, in the State's fourth notice, it sought to introduce evidence of Mr. Marler forcing the children to remain silent about abuse in the home by repeatedly threatening, manipulating, and abusing them if they did not lie to others.  The State alleged Mr. Marler threatened, manipulated, beat, and isolated the children to prevent disclosure of the abuse, and this evidence was relevant to show plan, motive, intent, lack of mistake, and Mr. Marler's guilty conscience.  In response, Mr. Marler argued these events did not happen, and he would suffer prejudice if they were admitted.

[¶9]     The district court held a hearing, and in a lengthy written order, concluded that much of the proposed Rule 404(b) evidence was admissible.  First, the court held the "daddy tax" massage evidence was relevant to show "motive, intent, [and] course of conduct," and to show how "innocent requests for massages evolved into sexual contact."  The district court also found the evidence was relevant because Mr. Marler disputed the sexual assault allegations.  The court found the evidence was not unnecessarily cumulative, and after weighing several factors, concluded it was more probative than prejudicial, given its ability to show "family dynamics."

[¶10]   As to the second notice, the court held evidence of punishments such as "spankings with objects, withholding food, excessive exercise in cold temperatures, punching or striking the children and withholding visits by biological relatives" was relevant to show Mr. Marler's opportunity, intent, and motive to gain acquiescence from the victims.  The court concluded it was also relevant to show Mr. Marler's "alleged plan and course of conduct to instill fear and create a culture of silence in the children" so they would not disclose any physical or sexual abuse.  In addition, the court found the evidence was relevant to explain the history of events that led up to and continued during the sexual abuse, and to explain why the children lied or delayed disclosure.  Further, the court deemed the evidence relevant to show Mr. Marler's "exertion of his authority over the members of his household."  The district court found the evidence of the children's punishments was not cumulative and was more probative than prejudicial because it

4

showed intent as alleged in the case. It was also important to show motive and course of conduct, and illustrated the history of the relationship between Mr. Marler and the children.

[¶11] Next, as to the third notice, the district court found the evidence of other incidents of touching or observing the children in stages of undress was relevant to show motive for sexual gratification and was evidence of grooming. According to the district court, this evidence was also relevant to show course of conduct and plan and scheme to normalize his behavior with his victims. The court concluded that the evidence also showed the history of the relationship between the parties and how it allegedly "progressed from him watching, to touching, to ultimately sexual contact or intrusion." Because Mr. Marler denied all the sexual allegations against him, this evidence was not unnecessarily cumulative and was "particularly probative" on issues of motive and intent.

[¶12] Finally, regarding the fourth notice, the district court found evidence of "threats, manipulation, beatings, and isolation" was relevant to show Mr. Marler's intent and motive to "gain acquiescence" by the victims. They were part of Mr. Marler's plan and course of conduct to "instill fear" and "create a culture of silence" so the children would not disclose the abuse. The court also found the evidence was not unnecessarily cumulative and was more probative than prejudicial.

[¶13] The district court's order also specified which witness could testify to each uncharged act, and that each witness could only testify to events they witnessed or participated in personally. With respect to instructing the jury on the admitted Rule 404(b) evidence, the parties agreed to the district court's proposal to give a long-form limiting instruction before opening statements and a short-form instruction before each witness testified regarding other acts under Rule 404(b).

**Trial**

[¶14] Mr. Marler's jury trial lasted eleven days. As planned, the court read the long-form jury instruction regarding Rule 404(b) evidence at the beginning of trial. Mr. Marler denied the sexual abuse allegations and claimed the children "fabricate[d] the sexual assault allegations" because they wanted to leave the Marler house and return to their biological families. Many of the adopted and foster children testified at trial, as well as law enforcement, and one of Mr. Marler's biological children. The pertinent testimony from the witnesses follows.

*AW Testimony*

[¶15] AW testified first. Mr. Marler was charged with three charges related to AW: one charge each of first- and second-degree sexual abuse against a minor, and one battery charge (counts four, five, and fourteen). AW came to the Marlers in May 2013 at age nine, along with her biological sisters. She stayed with the Marlers until April 2014. During her

testimony, AW detailed her "very strained" relationship with the Marlers. The State then announced it would introduce Rule 404(b) evidence, and the district court read the following short form instruction:

> Ladies and gentlemen, you are about to hear other acts evidence. You are instructed that you may not use this other acts evidence to decide whether the defendant carried out the acts involved in the crimes charged in this case – that last line should be crossed out there. Remember, even if you find that the defendant may have committed other acts in the past, this is not evidence that he may have committed the crimes charged within this case. You may not convict a person simply because you believe he committed others acts in the past. The defendant is on trial for only the crimes charged. And you may consider the evidence of prior acts only on the issue of motive, intent, course of conduct, plan, or scheme.

[¶16] AW described the "daddy tax" massages imposed by Mr. Marler. AW stated she, KAM, and KOM would straddle Mr. Marler and give him shoulder and back massages "a [c]ouple times a week," and Mr. Marler would do the same to the girls. She testified no boys were involved in the massages.

[¶17] AW also described discipline the children received in the form of being required to stand for long periods of time, and "severe exercise, restrictions to food, being locked in our rooms." She also detailed an occasion when Mr. Marler made her run outside in the snow while only wearing pajamas and socks, and another time when Mr. Marler hit her on the left side of her torso with a broom handle and left bruises after she dropped something while cleaning the garage. AW reported the physical abuse to her biological mother, and together they reported the abuse to AW's caseworker. [*Id.* at 478-80]. She recalled, though, "everything that we told our caseworker was told back to the Marlers, and we were disciplined for it when we got home that day."

[¶18] AW then described the alleged sexual abuse Mr. Marler inflicted upon her. She testified that Mr. Marler touched her inappropriately "at least more than ten times," and described a specific instance when Mr. Marler "rubbed up his hand up my leg of my pajama pants … and over the crotch area of my pajamas [with] a hole in the crotch." Mr. Marler then allegedly rubbed her vagina and penetrated her vagina with his fingers. AW did not tell her mother about the alleged sexual abuse until much later "because of the results of trying to tell about the physical abuse." She added that Mr. Marler told her she would be in trouble if she "told anybody what was going on."

[¶19] During AW's testimony, the State briefly asked her about her father's death:

> Q: Shifting gears just a little bit. Before you got to the Marlers, had your father passed away?

6

A: Yes.

Q: Were you still dealing with the emotions of your father's passing at – when you were with the Marlers?

A: To a degree, yes.

Q: Were you – did Mr. Marler ever console you about them?

A: No.

Q: Would he ever go into your room and console you about them?

A: No. I did not talk about my father's passing with anybody.

Q. You didn't talk with anyone in the home about your father's passing?

A. No.

Q. Okay. Did he ever pray with you?

A. Praying was a constant thing in the household for everybody, it wasn't just me individually.

Q. Did he ever pray with you in your bedroom?

A. No.

Q: When did you become aware of your father's suicide?

A: I wasn't aware that it was a suicide until I was in my early teenage years.

Q: Around 12, 13?

A: Yes.

Q: Okay. How were you told about your father's suicide?

A: It was a thing that had been brought up in family therapy at the time, and my mom had finally told us what had really happened. We just knew that my dad had passed away, and we were never told the specifics of how.

[¶20] During cross-examination, Mr. Marler impeached AW using forensic interview transcripts from 2016 and 2023, and she acknowledged several discrepancies between her trial testimony and previous statements. The discrepancies included how soon after she arrived at the Marlers the inappropriate touching began, how often the inappropriate touching occurred, and why she had a hole in her pajamas. The jury found Mr. Marler not guilty of both sexual abuse charges against AW, but found him guilty of battery for hitting her with the broom handle.

*KOM Testimony*

[¶21] KOM testified next. Mr. Marler was charged with one charge of battery (count 12) against KOM for punching her in the nose. The Marlers adopted KOM when she was three years old, and at the time of trial, she was sixteen. After KOM described the Marler home and a typical day living there, the State informed the district court it was going to elicit Rule 404(b) testimony from her. As a result, the district court read the short-form Rule 404(b) jury instruction for a second time.

[¶22] KOM testified that the Marlers imposed several forms of punishment on the children. KOM stated she was often hungry because meals were frequently taken away as

7

punishment. The children were also made to "exercise for very long periods of time, like, lifting weights … [performing] ups and downs … high knees" and "circuits." The circuits were "a hundred jumping jacks, a hundred lunges, a hundred squats, a hundred push-ups, a hundred mountain climbs, and a hundred sit-ups." Spanking was also used as discipline, and the Marlers would use a belt, a board, or a piece of rubber to spank KOM on her bare buttocks.

[¶23] KOM then testified about the "daddy tax" massages and explained how Mr. Marler would lay down and have the children massage his back, calves, and feet. KOM explained how Mr. Marler favored KAM over the other children and spent more time in both KAM's and KPM's beds. KOM also sometimes saw KAM and KPM go into the master bedroom at night when Mrs. Marler was not home. However, KOM testified she never saw Mr. Marler touch anyone inappropriately.

[¶24] KOM then testified about an incident when Mr. Marler punched her in the face. She was about ten years old at the time and had gone into the boys' bedroom. Mr. Marler observed this from outside and was "very upset" when he came inside the house. He then punched KOM in the face with his fist. KOM agreed on cross-examination that until 2024, she told people that Mr. Marler accidentally hit her. She explained she was afraid to talk about what happened at the house because "it would usually come back to [Mr. and Mrs. Marler] and we would get in trouble." She admitted not being "forthcoming" in two interviews in 2023 because she was fearful of being sent back to the Marler home after having left. KOM also admitted that during an interview with a Department of Family Services investigator after being removed from the Marler home, she "lied in probably everything [she] said" because she was scared to go back to the Marlers.

[¶25] Mr. Marler was found guilty of battery against KOM.

*KJM Testimony*

[¶26] The State's next witness was KJM, who was not a victim of any of the charged offenses. KJM was placed with the Marlers when she was six years old, and the Marlers later adopted her. The district court did not give the short-form Rule 404(b) jury instruction before or during KJM's testimony.

[¶27] KJM first testified about the home in general, including the children's sleeping arrangements. She stated she observed KAM and KPM go into Mr. Marler's bedroom when Mrs. Marler was not home. KJM testified KAM and KPM would stay in Mr. Marler's bedroom for "multiple hours" or even all night.

[¶28] KJM then described an incident when Mr. Marler held RDM "by the neck … and the back of the head, and then just put him in the snow face down." KJM also testified that

8

she did not see Mr. Marler punch KOM, but she did observe KOM's injured nose afterwards.

[¶29] Regarding the conditions in the home, KJM testified that toward the end of her time with the Marlers, the children were required to sleep on mattresses in the library "for quite a few months" after being caught stealing food. She explained the children stole food because "there would be times when we wouldn't really get fed."

[¶30] After leaving the Marler house, KJM acknowledged she lied during a 2023 interview when she stated she did not have any issues at the home. She explained she was afraid she would be returned to the Marler home and disciplined with spanking or "not getting fed."

### Sergeant Taylor Courtney Testimony

[¶31] Sergeant Taylor Courtney testified next for the State. He explained that after AW alleged physical and sexual abuse in 2016, he conducted a video interview with Mr. Marler. The State sought to introduce four audio clips from that interview, which the district court allowed, and all four clips were played in front of the jury. During the interview, Mr. Marler admitted he spanked the children but did not recall ever hitting anyone with a broom. He also denied any sexual contact with AW, but acknowledged laying down with her to pray about her father's death.

[¶32] Sergeant Courtney testified that during interviews he looks for patterns in people's speech, "because it can indicate hesitation. … It's an indication or a clue to an investigator if a person starts hesitating, stuttering, and doing things like that. That can indicate that they're struggling with a response." He indicated he observed hesitation from Mr. Marler when he was asking about the spankings.

[¶33] After the State's direct examination of Sergeant Courtney, Mr. Marler requested the entire 2016 recorded interview be played for the jury under the rule of completeness. He argued that because the State asked questions related to Mr. Marler's "honesty or evasiveness," the entire interview should be played for the jury. *Id.* The court declined Mr. Marler's request to play the interview in its entirety but did allow Mr. Marler to ask Sergeant Courtney about the interview as a whole.

### Investigator Lisa Lauderdale Testimony

[¶34] The State next called Investigator Lisa Lauderdale of the Natrona County Sheriff's Office to testify about a 2021 investigation of Mr. Marler and her continued involvement in the case since that time. Investigator Lauderdale obtained a search warrant for the Marlers' home and seized a DVR recording system that had been used to film inside the home.

9

[¶35]  In May 2023, the Department of Family Services notified Investigator Lauderdale that KPM alleged Mr. Marler had inappropriate contact with her.  Investigator Lauderdale conducted an initial interview with KPM and arranged for a forensic interview.  Ultimately, she conducted over 100 interviews, including interviews with seven of the other children.

[¶36]  In January 2025, the Sheriff's Office evaluated 1,526 video clips extracted from the DVR that was seized in 2021.  All the videos were from 2020 and 2021, and the State played several of those videos for the jury during Investigator Lauderdale's testimony.  She described each of the videos played for the jury.  One exhibit showed Mr. Marler leading RBM out of the library where children were sleeping, and then Mr. Marler and RBM returning to the room.  When they returned, RBM was naked and had injuries on the side of his body; Mr. Marler was holding a belt.  Another exhibit showed Mr. Marler hitting RBM, KAM, and another child.  And another exhibit showed Mr. Marler coming into the library, lying face down in the middle of the girls' mattress where they were sleeping, and then four girls moving on top of Mr. Marler and massaging his back, thighs, and legs.

[¶37]  On cross-examination, Mr. Marler asked Investigator Lauderdale about an interview of KPM that took place at the regional juvenile detention center after KPM had been arrested.  Investigator Lauderdale stated KPM said she was sexually abused by Mr. Marler while Mrs. Marler was away on a trip, but that was all she remembered about the incident.  KPM also reported she wanted to live with her biological dad rather than the Marlers.  Investigator Lauderdale also testified about her interviews with the other children.  KOM and KJM did not report sexual abuse, and KOM first said Mr. Marler accidentally hit her in the nose but then changed her story after she had been out of the house for a while.  RBM did not share any concerns about living with the Marlers.

*KAM Testimony*

[¶38]  KAM then testified.  Mr. Marler was charged with six counts involving KAM – one count of sexual abuse of a minor in the first degree, two counts of sexual abuse of a minor in the second degree, two counts of sexual abuse of a minor in the third degree, and one count of battery (counts six through ten and count sixteen).  KAM arrived at the Marler house in 2010 when she was seven or eight years old, and the Marlers later adopted her.  She testified that at first her relationship with Mr. Marler was "normal" and he was like "a parent."  The State then notified the court it would introduce Rule 404(b) evidence, and the court again read the short-form Rule 404(b) jury instruction.

[¶39]  KAM explained how things changed after she was adopted.  As more children came into the home, "more restrictions were made" and "more rules were put in place."  KAM was pulled from public school shortly after she arrived at the home.  KAM testified that "[a]ll the cupboards were locked.  Cameras were put up, alarms were put up, and we had less freedom."  She explained the children were given limited time to use the bathroom and

10

were required to keep the door open when they did, and that an adult supervised. Also, the children were made to change their clothes with the door open, and Mr. Marler sometimes watched.

[¶40] KAM also testified that after she was adopted discipline became "more aggressive." She explained punishment in the form of exercise, including "running up and down the stairs for long periods of time, circuits of a hundred sets of push-ups, sit-ups, squats, lunges, jumping jacks." She also testified there were spankings, including sometimes "more than twenty times," with boards, rubber strips, and belts. KAM testified that the Marlers often made the children stand for long periods of time as a form of punishment. KAM stated the discipline was often after the children stole food or were disrespectful.

[¶41] KAM also testified about her physical relationship with Mr. Marler, and that after she was adopted she "became more of a partner, romantically." She described the "daddy tax" massages and stated "all the kids" would rub Mr. Marler's back, arms, shoulders, legs and feet. She also stated she and KPM would often give Mr. Marler massages alone in his bedroom or their bedroom. In those instances, after KAM rubbed lotion on Mr. Marler's shoulders, back, inner thighs, upper thighs, calves, and feet, he would tell her to remove her clothes, and then he would rub lotion on her "arms, shoulders, back, inner and upper thigh, [ ] butt, calves, and [ ]feet." Mr. Marler began massaging KPM when she was around age nine, ten, or eleven. They also showered together "a couple of times," and Mr. Marler would ask her to wash his legs, back, and buttocks with a sponge. KAM witnessed Mr. Marler touch KPM "inappropriately" as well, and Mr. Marler would ask both KAM and KPM to spend the night in his room if his wife was not home.

[¶42] KAM also described the first time Mr. Marler touched her genitals when she was ten or eleven years old. KAM testified Mr. Marler took off her pajama pants and underwear, then rubbed her legs and thighs, and "just kept getting closer and closer" until he touched KAM's vagina and pelvic bone. She also testified that when she was thirteen or fourteen years old, she woke from a deep sleep to find Mr. Marler on top of her "grinding" on her pelvic bone while moaning. Mr. Marler pulled down his underwear, but KAM asked him to stop "because it hurt."

[¶43] KAM described another incident that happened in Mr. Marler's bed when she was a teenager. As they were both naked after giving each other massages, Mr. Marler was laying on top of KAM when he began "humping" KAM and the bed. His penis was touching KAM's hip, after which KAM "felt wetness in the bed," but did not know why. Another time, when she was fifteen, after massages had occurred and their clothing was off, Mr. Marler grabbed KAM's hand and put it on his penis and moved her hand up and down.

[¶44] The "worst" sexual encounter occurred when KAM was fifteen. After a massage, Mr. Marler "humped" and "grinded" on top of KAM, who was naked. Mr. Marler then

11

pulled down his underwear so his penis was touching KAM, and "he kept going harder and harder and harder and faster, and it really hurt." At one point, he "rammed" his penis inside KAM, and she felt "extreme pain." She said Mr. Marler then stopped, apologized, and left.

[¶45] KAM testified that she was afraid to talk about what happened in the Marler house "because they always found out … and we would be severely punished." Mr. Marler told KAM not to talk about him touching her because people would try to separate them and no one would "understand [their] love." He also told her, "he shouldn't love [her] like this but he can't stop." In 2016, when police came to the home to investigate AW's allegations, KAM spoke to police but was not honest because she was "scared to tell them anything of what was really going on," because she "still wanted to win [Mr. and Mrs. Marler's] favor."

[¶46] When KAM was around fifteen, she left the Marlers home after she told them she would call the police unless they let her leave. She said Mr. Marler was "moving on to the other girls and younger girls," and also that her "feet were starting to swell really bad from standing" and she was "starving." KAM moved to the Cowboy Challenge Academy and while there, in 2021, reported the physical and sexual abuse she endured at the Marler house. She was "reluctant to speak" because she did not want to return to the Marlers and "didn't know who the good guys were at the time."

[¶47] On cross-examination, KAM was impeached with information that conflicted with some of her testimony, including whether the reason she did not want to return to the Marlers was because she had fallen in love with a fellow academy cadet and worried she would not be allowed to date him.

[¶48] The jury found Mr. Marler guilty of all charges relating to KAM.

*RBM Testimony*

[¶49] RBM was not a victim of any charges but was placed with the Marlers when he was nine months old. He was eighteen at the time of trial. The court did not give the short-form Rule 404(b) jury instruction during RBM's testimony.

[¶50] RBM first testified about his observations of Mr. Marler treating the girls differently than the boys. He said Mr. Marler favored the girls with candy and other privileges. RBM also testified he observed KAM and KPM go into Mr. Marler's bedroom when Mrs. Marler was away but never saw any sexual abuse. RBM testified about punishments he received or observed. He stated that Mr. Marler spanked him with a belt, a piece of wood, and a piece of rubber, and that he was subjected to exercise circuits that were "kind of" excessive.

*RGM Testimony*

12

[¶51]   Mr. Marler was charged with one count of battery against RGM (count seventeen). RGM testified he lived with the Marlers for eleven years, beginning when he was three or four years old.  The district court did not give the short-form 404(b) jury instruction during RGM's testimony.

[¶52]   RGM testified about the discipline imposed in the household.  He stated the children frequently stole food because they were hungry, as the Marlers would withhold meals as punishment.   RGM also described the punishments Mr. Marler administered after the children were caught stealing food.  According to RGM, Mr. Marler spanked the children with either a piece of wood trim or a strip of rubber like something cut from a truck's mud flap.  The children were required to pull down their underwear before the spanking, which was usually administered to the buttocks but sometimes on the lower back or head.  RGM recounted one occasion when Mr. Marler struck him on the back of the head with the rubber strip multiple times, causing a cut to his head.

[¶53]   RGM further testified that KAM was Mr. Marler's favorite child.  He stated that when she asked for food for the children, Mr. Marler would grant the request, whereas he would not do so for the other children.  After KAM left the Marlers' home, KPM became Mr. Marler's favorite child.

[¶54]   During cross-examination, Mr. Marler questioned RGM about his time in counseling and his placement at various institutions.  RGM acknowledged that he had not reported the abuse in those settings.  RGM explained he could not recall "every little detail" about "a decade of trauma" during that 2023 interview and that his memories became clearer over time.

[¶55]   The jury found Mr. Marler guilty of one count of battery for striking RGM with a rubber strip.

*RFM Testimony*

[¶56]   RFM was the victim of one count of child endangerment against Mr. Marler (count thirteen).  RFM testified he came to live with the Marlers at age four or five, and the Marlers adopted him when he was seven.  The court did not give the short-form 404(b) jury instruction during his testimony.

[¶57]   RFM testified that the Marlers used exercise circuits, and spankings with firewood, a leather belt, and a rubber slab for punishment.  Mr. Marler "believed in group punishment. If somebody did something, then everybody got punished."  RFM testified he bled from the spankings he received "a few times."

[¶58]   RFM testified that Mr. Marler once kicked him off a roof as he was clearing snow. Mr. Marler yelled that he was going too slow and then kicked him in the back.  RFM slid

13

down the roof, and a piece of metal sliced his upper thigh, peeling the skin back and leaving a "sizeable gash." He then fell off the roof.

[¶59] RFM also testified that Mr. Marler favored the girls, often calling KAM and KPM into his bedroom where they would stay thirty minutes to an hour. RFM could hear moaning, crying, and talking. RFM stated he never told law enforcement about these incidents because "they wouldn't believe us." Before police would arrive at the house, Mr. Marler told the children to "say nothing is going on."

[¶60] On cross-examination, RFM agreed that even though he said he "rarely" left the house, he went to restaurants, church, and doctor visits. RFM never reported his leg injury because Mr. Marler told him not to.

[¶61] The jury found Mr. Marler guilty of child endangerment for kicking RFM off the roof.

*RDM Testimony*

[¶62] RDM was the victim of a battery charge against Mr. Marler (count fourteen). RDM testified he lived with the Marlers from approximately age two until age fourteen. The court did not give the short-form 404(b) jury instruction during his testimony.

[¶63] RDM described the children's living conditions and discipline, explaining that as he got older, "it got worse." RDM stated the children were often deprived of adequate food. They would sneak food because the Marlers would not feed them enough, and at times they were given rotting potatoes. He also described routine group punishments in which the children would "get spanked," or "even get beat" on their bare bottoms with a piece of rubber or a leather belt.

[¶64] RDM recounted several incidents of physical abuse by Mr. Marler. On one occasion, Mr. Marler punched KOM "right in the face" leaving her nose visibly disfigured for the remainder of RDM's time in the house. He also testified that he witnessed Mr. Marler "just boot[]" RFM off a roof, causing him to fall. RDM also explained that Mr. Marler once tackled him, knocked him to the ground, and shoved his face into the snow, causing his nose to bleed.

[¶65] RDM also testified regarding Mr. Marler's conduct involving the girls in the household. He stated that Mr. Marler would go into the girls' bedroom "almost every night [Mrs. Marler] was gone." He observed KPM and KAM go into Mr. Marler's bedroom "for a couple hours" or other times overnight. RDM further testified that Mr. Marler favored KAM by giving her treats and hugging her "just so that he could get up with her later that night." After KAM left the Marler house, RDM testified that Mr. Marler had similarly started giving KPM special treatment.

14

[¶66]  The jury found Mr. Marler guilty of battery for shoving RDM's face in the snow.

*DW Testimony*

[¶67]  DW was the alleged victim of one count of third-degree sexual abuse, for which Mr. Marler was acquitted (count eleven).  She was placed with the Marlers at age five for one year from 2013 to 2014.  The court did not give the short-form 404(b) jury instruction during her testimony.

[¶68]  DW testified punishments included "lots of exercise or loss of food privileges or different types of food than others would receive."  She also testified about group punishment, and that she saw Mr. Marler hit AW with a broom.  DW also testified that Mr. Marler would watch the children change clothing.

[¶69]  DW testified about a specific day when Mr. Marler brought her into the master bedroom, put her on the bed, pulled down her pants and underwear, and put his fingers inside her vagina.  She said he also "put his penis inside her" and told her not to tell anyone.  Although DW disclosed this abuse to her mother in 2016, she said she "didn't know how to talk about it" when she was later interviewed by police.

[¶70]  On cross-examination, Mr. Marler challenged the accuracy of DW's testimony.  She acknowledged she told an interviewer Mrs. Marler was in the bedroom during the alleged physical assault but did not mention that in her direct testimony.  DW also agreed her family was upset she was placed in foster care with the Marlers.

*KPM Testimony*

[¶71]  KPM, the victim of three counts of sexual abuse (counts one, two, and three), was the last of the children to testify at trial.  She lived with the Marlers for a short time when she was an infant and was sent to live with them for the second time when she was seven years old.  She testified that her experience at the Marler house was "very pleasant" at first.  The Marlers then adopted her in 2016 when she was ten years old.

[¶72]  After her adoption, KPM testified things became "rougher" and the "discipline was much different."  The children were made to sit at desks much of the day in 2017, meals became "less hearty," and discipline evolved from a "swat" to the children being spanked on their bare bottoms with "a board or a piece of rubber or [Mr. Marler's] belt" between "15 to 25" times.  KPM also discussed exercise circuits that involved hundreds of sets of squats, lunges, sit-ups, push-ups, and jumping jacks as part of the discipline regimen.

[¶73]  KPM testified about the physical relationship between she and Mr. Marler.  She explained the "daddy tax" massages were a daily occurrence, and Mr. Marler would

straddle KPM or KAM while rubbing or touching their buttocks. At this point during KPM's testimony, the State interjected and said, "we all forgot about the 404(b) limiting instruction," and the district court then read the short-form Rule 404(b) jury instruction. KPM then continued by explaining that she and KAM had "a little more freedom [than the other children]," and said she thought this was because of "sexual things that had happened."

[¶74] KPM then detailed specific instances of sexual contact between she and Mr. Marler. In 2019 or 2020, she was in the bottom bunk bed, and Mr. Marler came into the room and began rubbing her thigh and touched her vagina with his thumb. When he asked her if she enjoyed it, she "very clearly said no." He then left the room.

[¶75] Again in 2019 or 2020, when KPM was fourteen or fifteen, she described Mr. Marler rubbing his hands on her and KAM's backs, thighs, chest, upper thighs, and buttocks. Mr. Marler then laid down between KPM and KAM while moving his crotch against their thighs, lower backs, and buttocks while he stated, "I know I shouldn't love you like this but I do."

[¶76] KPM described a third incident when Mr. Marler asked her and KAM to come into his bedroom at night. While sitting between them, Mr. Marler touched their buttocks and chests with his hands, and then KPM felt Mr. Marler's penis touching her thigh and buttocks. KPM said this was a routine occurrence, "pretty much whenever [Mrs. Marler] was out of the house for the night." If the girls declined his invitation, Mr. Marler would "be upset or angry throughout the [next] day."

[¶77] KPM was afraid to tell anyone about the abuse "because anytime we had tried to tell anyone or anything, … we would be confronted and disciplined for it." KPM ran away from the Marlers in 2022 and stayed with her biological family. She did not share any specifics with her biological family, but told them, "there was abuse involved." In May 2023, after she was detained at the juvenile detention center, she told staff there about the sexual abuse because her only choice was to stay at the jail or go back to the Marlers.

[¶78] On cross-examination, KPM testified "things started getting bad between 2019-2022 and referenced the "excessive, excessive points of discipline." Food "became an issue" when the Marlers started limiting meals, and she was upset when Mr. Marler deleted her Snapchat account. She agreed she thought about leaving the Marler house and wanted to reconnect with her biological family.

[¶79] Eventually, KPM began attending public school and "had more freedom." She was also reconnecting more with her biological family, though she never told them, nor any teachers or her counselor, about the abuse from Mr. Marler. In 2021, she spoke to Investigator Lauderdale about the abuse and "felt safe." Previously, she recalled that if any of the children said anything negative about the Marlers, they would be punished.

16

After KPM was arrested in 2023, she again participated in an interview with Investigator Lauderdale, and told her Mr. Marler rubbed her chest and grabbed her buttocks, but did not mention anything more.

[¶80] KPM testified she filed a civil suit against Mr. Marler when she turned eighteen and discussed the suit with some of the other adopted children. At this point in the cross-examination, Mr. Marler's counsel asked KPM if she had a child. The State objected, and during a discussion outside the presence of the jury, counsel for Mr. Marler explained that during a break in Investigator Lauderdale's interview of KPM in 2023, KPM lied to a jail guard and told the guard she had a two-year-old daughter (which she did not). Mr. Marler requested to impeach KPM's veracity under W.R.E. 404(a)(2), 405(b), due process, and the confrontation clause. The State argued KPM's conversation with jail staff was irrelevant. The district court agreed with the State, sustained the State's objection, and did not permit Mr. Marler to question KPM about her false statements.

[¶81] Mr. Marler was found guilty of all three counts of sexual abuse against KPM.

*Dr. Matt Gray Testimony*

[¶82] Dr. Matt Gray testified on the State's behalf about child abuse generally. He stated it is a "common misconception" that victims tend to report abuse right away and that only ten percent of victims formally report abuse. Dr. Gray also described grooming as a "constellation of tactics that perpetrators will use to gradually, incrementally have sexual contact, sexual activity with a child." He stated that grooming is "designed to increase the likelihood and escalation of that activity and also designed to compel silence, to prevent the person from disclosing those experiences."

**Convictions and Sentences**

[¶83] The jury convicted Mr. Marler of eight felonies and six misdemeanors. The district court sentenced him to fourteen consecutive sentences—totaling 125 to 175 years for the eight felonies and 1,265 days for the misdemeanors. This appeal followed.

**DISCUSSION**

I. **The district court did not abuse its discretion by admitting evidence of other acts under Rule 404(b).**

[¶84] Mr. Marler argues the district court erred when it admitted evidence regarding physical punishment, withholding of food, and isolation, because this evidence was irrelevant to the crimes charged. He also argues evidence regarding massages was cumulative and unfairly prejudicial, though he concedes the evidence was "potentially

relevant to show grooming behavior." Finally, Mr. Marler criticizes the court's failure to give the short-form Rule 404(b) jury instruction before each witness testified.

[¶85] Because Mr. Marler filed a pretrial demand for notice of Rule 404(b) evidence, we review the admission of evidence under Rule 404(b) for an abuse of discretion. *Winters v. State,* 2019 WY 76, ¶ 79, 446 P.3d 191, 215 (Wyo. 2019). A trial court's "'rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.'" *Id.* (citation omitted). Rule 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[¶86] Rule 404(b) allows "evidence of specific instances of conduct to prove 'consequential facts' such as motive." *Winters,* ¶ 82, 446 P.3d at 216 (quoting *Gleason v. State,* 2002 WY 161, ¶ 17, 57 P.3d 332, 339 (Wyo. 2002). "Motive is generally defined as that which leads or tempts the mind to indulge in a particular act." *Id.* (quoting *Swett v. State*, 2018 WY 144, ¶ 39, 431 P.3d 1135, 1146 (Wyo. 2018); *see also Brower v. State*, 1 P.3d 1210, 1214 (Wyo. 2000) ("When the accused denies any wrongdoing, an evidentiary conflict exists between the victim and the accuser, and evidence of motive assists a jury in resolving the ultimate issue."). When evidence is in conflict, a finder of fact would be extremely interested in other information that might be available to help resolve the ultimate issue. *Winters,* ¶ 82, 446 P.3d at 216 (quoting *Elliot v. State*, 600 P.2d 1044, 1048-49 (Wyo. 2000)). Evidence of motive would be such information. *Mayhew v. State,* 2019 WY 38, ¶ 31, 438 P.3d 617, 627 (Wyo. 2019) (quoting *Swett*, ¶ 40, 431 P.3d at 1146 (concluding "sexual behavior with a defendant's minor children, adopted children, or stepchildren is unusual sexual behavior permitting admission of uncharged misconduct evidence to prove motive when the accused denies that the charged conduct ever occurred")).

[¶87] Other proper purposes to admit Rule 404(b) evidence include "opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Leyva v. State,* 2007 WY 136, ¶ 27, 165 P.3d 446, 454 (Wyo. 2007) (citing W.R.E. 404(b)). We have stated that "when intent is at issue, evidence of several similar, prior acts may be

18

admissible." *Anderson v. State*, 2022 WY 119, ¶ 22, 517 P.3d 583, 590 (Wyo. 2022) (quoting *Swett*, ¶ 27, 431 P.3d at 1143). For instance, evidence of prior assaults is relevant to support the credibility and corroborate the testimony of the victims. *Moore v. State*, 2003 WY 153, ¶ 23, 80 P.3d 191, 197 (Wyo. 2003). Such evidence may be admissible because it helps the jury understand the relationship between the parties. *See Santistevan v. State,* 2024 WY 17, ¶ 17, 542 P.3d 200, 206 (Wyo. 2024).

[¶88] Additionally, Rule 404(b) evidence is "admissible if it forms part of the history of the event or serves to enhance the natural development of the facts" because "events do not occur in a vacuum, and the jury has the right to have the offense placed in its proper setting." *Anderson,* ¶ 25, 517 P.3d at 591 (*quoting Garrison v. State,* 2018 WY 9, ¶ 27, 409 P.3d 1209, 1217 (Wyo. 2018)). However, this Court recognizes "the danger that a course of conduct exception, standing alone, could swallow the general rule against admission of 'other crimes, wrongs, or acts,' [so] it must be linked to another legitimate purpose." *Santistevan,* ¶ 18, 542 P.3d at 206 (quoting *Anderson,* ¶ 25, 517 P.3d at 591). Because of the "inherent danger for prejudice" associated with Rule 404(b) evidence, we require a district court to conduct a four-part test to determine the admissibility of other crimes, wrongs, or acts:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Gleason*, ¶ 18, 57 P.3d at 340 (citing *Vigil v. State*, 926 P.2d 351, 357 (Wyo. 1996)). "Evidence is not relevant and admissible under Rule 404(b) if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes." *Swett*, ¶ 23, 431 P.3d at 1142 (citation modified). A district court should also consider the following five factors to determine the probative value of the evidence:

> 1. How clear is it that the defendant committed the prior bad act?
>
> 2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?
>
> 3. Is other evidence available?
>
> 4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

*Anderson,* ¶ 14, 517 P.3d at 588-89.  Then, the district court should weigh the following six factors against the probative value of the evidence:

> 1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.
>
> 2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.
>
> 3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.
>
> 4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.
>
> 5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).
>
> 6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Id.* (quoting *Barrett v. State*, 2022 WY 64, ¶¶ 46–47, 509 P.3d 940, 950 (Wyo. 2022)).

[¶89]  We do not reapply the *Gleason* test anew on appeal.  *Anderson,* ¶ 15, 517 P.3d at 589.  Instead, this Court determines whether there is a legitimate basis for the district court's decision.  *Id*.

[¶90]  We agree with the district court that the challenged Rule 404(b) evidence was relevant to establish motive, intent, and course of conduct, as well as provide the jury with an understanding of the family dynamics underlying the charged offenses.  In its ruling on each notice of Rule 404(b) evidence, the district court properly identified the specific

purpose for which the evidence was offered, and balanced its probative value against the danger of unfair prejudice, explaining the factors that weighed for and against admission.

*Punishment Evidence*

[¶91] Mr. Marler argues evidence of punishment in the form of spanking, exercise, and withholding food, was not relevant to the charged crimes and was unfairly prejudicial. However, we agree with the district court this evidence was relevant to show Mr. Marler's intent and motive to gain submission by the victims. Although Mr. Marler initially provided stability for the children, his behavior changed as they got older. And while Mr. Marler acknowledged physically punishing the children, he denied physical and sexual abuse. As this Court has recognized, "[w]hen the accused denies any wrongdoing, an evidentiary conflict exists between the victim and the accuser, and evidence of motive assists a jury in resolving the ultimate issue." *Mayhew*, ¶ 36, 438 P.3d at 628 (quoting *Brower v. State*, 1 P.3d 1210, 1214 (Wyo. 2000)).

[¶92] This evidence of punishment was also relevant to demonstrate a course of conduct and plan designed to exert control over the children and instill fear and create a culture of silence. *See Humphrey v. State*, 962 P.2d 866, 871 (Wyo. 1998) (finding evidence of prior acts illustrating family dynamics to which the victim was subjected and demonstrating defendant's methods of controlling family members was admissible). As the district court explained, "the evidence is relevant to explain the history of the events that led up to and continued during the alleged sexual abuse and to explain why the children either allegedly lied during earlier investigations or delayed disclosure." Again, although Mr. Marler admitted he utilized corporal punishment to discipline the children, specifically spanking and exercising, he denied withholding food and denied all allegations of battery and child endangerment. The district court properly admitted the evidence under Rule 404(b) to establish the history and nature of the relationship between Mr. Marler and the children, and to show how he used punishment as part of his course of conduct and plan to induce cooperation and silence, and to prevent detection.

[¶93] Analyzing this evidence under *Gleason*, the district court also correctly concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The evidence provided the jury with essential context for evaluating the conflicting testimony of Mr. Marler and the children, a central issue at trial. The district court's primary emphasis in its ruling was on the significant relevance of the evidence as to motive, intent, course of conduct, and family dynamics, although the district court did discuss possible prejudice. For example, the district court explained that the punishments meted out by Mr. Marler were less reprehensible than the sexual abuse and battery charges levied against him, and that the jury was less likely to punish Mr. Marler for them because the majority of the case was centered on allegations of sexual misconduct.

21

[¶94]   In the end, we conclude that the district court did not abuse its discretion related to admission of evidence of punishment of the children by Mr. Marler, as the court provided a legitimate basis for admission of the evidence under Rule 404(b).  *See Anderson,* ¶ 11, 517 P.3d at 588.

*"Daddy Tax" Massage Evidence*

[¶95]   As to the challenged Rule 404(b) evidence regarding massages known as a "daddy tax," Mr. Marler argues the evidence was improperly admitted because it was cumulative and unfairly prejudicial, though he admits its "potential relevan[ce]" to show grooming behavior.

[¶96]   Other acts evidence "is admissible if it serves a proper purpose, and is excluded only if its sole purpose is to prove that a defendant has a disposition to commit crimes."  *Leyva,* ¶ 27, 165 P.3d at 454.  Admissibility under Rule 404(b) is not limited to the purposes set forth in the rule, and we have adopted a liberal approach toward admitting uncharged misconduct evidence.  *Gleason*, ¶ 27, 57 P.3d at 340.  As referenced above, other acts evidence is admissible "if it forms part of the history of the event or serves to enhance the natural development of the facts" because "events do not occur in a vacuum, and the jury has the right to have the offense placed in its proper setting."  *Anderson,* ¶ 25, 517 P.3d at 591 (citation omitted).  Also, "not all evidence which is entirely duplicative is … cumulative and excludable."  *Kobos v. Everts,* 768 P.2d 534, 546 (Wyo. 1989) (citation omitted).  At times, it is entirely reasonable for a party to insist multiple witnesses may make a case stronger, even though they will all testify in the same vein.  *See id.*

[¶97]   We disagree the "daddy tax" massage evidence was unnecessarily cumulative.  This was not a case in which the State repeatedly or improperly paraded witnesses to recount the same incident cumulatively; rather, the court only allowed each witness to testify as to their own personal experience and observations.  Of the ten witnesses who testified about the "daddy tax" massage evidence, eight of those witnesses were victims of a charged crime.

[¶98]  In addition, we agree with the district court's conclusion that, weighing the probative value of the evidence against its potential for unfair prejudice, the evidence was more probative than prejudicial.  The "daddy tax" massage evidence demonstrated a predictable, recurring pattern of behavior that directly illuminated Mr. Marler's motive and systematic course of conduct.  *See, e.g., Brown v. State,* 817 P.2d 429, 435 (Wyo. 1991).  Also, because Mr. Marler denied committing the acts for which he was charged, or claimed that some of his acts were innocuous, this remained a genuinely contested issue and was also highly probative for that reason.  *See Moser,* ¶ 17, 409 P.3d at 1243 (finding evidence of school employee's interactions with other students admissible because it was relevant to the crimes charged and provided a context as to whether touching was "innocuous" as claimed by defendant).  The "daddy tax" massage evidence demonstrated a clear behavioral

pattern and provided relevant context about how Mr. Marler targeted and groomed the children by exploiting his parental role and initiating abuse through seemingly innocent touching — all as a means to gratify his sexual desires.

[¶99] Mr. Marler has not demonstrated that the "daddy tax" massage evidence was unnecessarily cumulative, or had little or no probative value, nor has he shown it was either extremely inflammatory or introduced to inflame the jury. We find no abuse of discretion in the district court's ruling that the "daddy tax" massage evidence was admissible.

*Limiting Instruction*

[¶100] Finally, and while he is critical of the fact that the district court failed to consistently provide the short-form Rule 404(b) jury instruction prior to each witness's testimony, Mr. Marler provides no cogent argument or citation to pertinent legal authority to argue that this was error. As a result, we need not consider the issue. *See, e.g., Pokrovskaya v. Van Gendersen*, 2025 WY 50, ¶ 14, 567 P.3d 1172, 1177 (Wyo. 2025). Even if this was error, the district court's oversight in omitting individual Rule 404(b) limiting instructions before some of the children testified (KJM, RBM, RGM, RFM, RDM and DW) did not result in prejudice to Mr. Marler. Each of those witnesses testified regarding the same general category of Rule 404(b) evidence already addressed by prior instructions. Their testimony concerned punishments, grooming behaviors, and observations they noticed Mr. Marler used to gain compliance and maintain control over the children. Nothing about their testimony materially expanded the permissible purpose for which the evidence was admitted or created a substantial risk that the jury would suddenly begin considering the evidence for an improper propensity purpose.

[¶101] Also, at the time of their testimony, the jury had already been repeatedly advised that the evidence could be considered only for the limited purposes identified by the court and not as proof that Mr. Marler acted in conformity with bad character. Specifically, the jury was verbally instructed on the proper use of Rule 404(b) evidence on at least five separate occasions: at the start of trial, and four times during witness testimony. The jury was also given a written copy of the long-form instruction for its deliberations. As we have repeatedly recognized, jurors are presumed to follow instructions given by the district court. *O'Dell v. State,* 2026 WY 26, ¶ 46, 584 P.3d 443, 453 (Wyo. 2026). There is simply no reasonable probability that repeating the same limiting instruction more often would have altered the verdict.

## II. The district court did not err when it limited Mr. Marler's cross-examination of KPM.

[¶102] Mr. Marler next argues the district court violated his constitutional right to confrontation and to present a complete defense when it did not allow him to cross-examine KPM about a time she lied to a jail guard. Specifically, Mr. Marler contends because his

23

defense was that he did not sexually abuse KPM and she was being untruthful in her accusations, this incident should have been allowed under Rule 405(b).

[¶103]  "Whether a defendant's constitutional rights to confrontation and to present a complete defense were violated is a question of law which we review de novo." *Detimore v. State,* 2024 WY 109, ¶ 8, 557 P.3d 1172, 1175 (Wyo. 2024) (citing *Farrow v. State,* 2019 WY 30, ¶ 52, 437 P.3d 809, 823 (Wyo. 2019)).  Although evidentiary rulings generally are reviewed for an abuse of discretion, a trial court's exercise of that discretion may not infringe on a defendant's constitutional rights.  *Garner v. State,* 2011 WY 156, ¶ 14, 264 P.3d 811, 818 (Wyo. 2011) (noting the constitutional right to confrontation of witnesses is not absolute, but subject to reasonable limitation pursuant to the trial court's discretion).  If a constitutional violation is established, the State bears the burden of proving the error was harmless beyond a reasonable doubt.  *See Tarpey v. State,* 2023 WY 14, ¶ 33, 523 P.3d 916, 927 (Wyo. 2023).  When applying the harmless error standard, this Court asks whether there is a reasonable probability the result would have been more favorable to the defendant had the error not occurred.  *Marler v. State,* 2025 WY 115, ¶ 40 n.1, 578 P.3d 30, 38 n.1, (Wyo. 2025).

[¶104]  The right to confront a witness and the right to present a complete defense are distinct but overlapping concepts under the Sixth Amendment of the United States Constitution.  The right to confront a witness guarantees a defendant has the "opportunity for effective cross-examination, [but] not cross-examination that is effective in whatever way, to whatever extent, the defense might wish."  *Detimore,* ¶ 17, 557 P.3d at 1177 (citations and emphasis omitted).  Accordingly, "a defendant's right to cross-examination of a witness is not unfettered, but is subject to the trial court's 'discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance.'"  *Id.*  Relatedly, the right to present a complete defense, and its limitations, are described as follows:

> The United States Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986);  *Hannon*, ¶ 62, 84 P.3d at 346.  "[T]he Constitution thus prohibits the exclusion of **defense** evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes* [*v. South Carolina*], 547 U.S. [319] at 327, 126 S.Ct. 1727 [164 L.Ed.2d 503] [(2006)].  **However, the Constitution does not prevent trial judges from applying well-established rules of evidence to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice,** confusion of the issues, or potential to mislead the jury. *Id.*  **The Constitution permits judges to exclude evidence that is** repetitive, **only**

24

**marginally relevant,** or poses an undue risk of harassment, prejudice or confusion of the issues. *Id.*

*Detimore,* ¶ 21, 557 P.3d at 1178 (quoting *Sparks v. State*, 2019 WY 50, ¶ 45, 440 P.3d 1095, 1109 (Wyo. 2019) (emphasis added in *Detimore*)).

[¶105] Rule 405(b) states that "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, or is in issue under Rule 404(a)(2), proof may also be made of specific instances of his conduct." W.R.E. 405(b); *see also Farrow,* ¶ 54, 437 P.3d at 823 (recognizing W.R.E. 405(b) allows evidence of specific instances of conduct).

[¶106] The district court determined that while KPM's credibility was relevant to the proceedings, her false statement carried little probative value. The statement was unrelated to the allegations against Mr. Marler and was made during a break in KPM's forensic interview to a detention center employee rather than to investigators. Nothing in the record suggests investigators relied on the statement in evaluating KPM's allegations or that it otherwise formed part of the investigative process. Because the falsehood was collateral to the investigation, it bore no connection to the reliability of KPM's accusations against Mr. Marler.

[¶107] The district court did not err in excluding the statement. The Confrontation Clause does not prevent a court from limiting cross-examination directed toward matters of only marginal relevance. *Detimore,* ¶ 17, 557 P.3d at 1177. Moreover, even assuming KPM's statement possessed some impeachment value, its exclusion did not deprive Mr. Marler of his constitutional rights. The jury heard substantial evidence bearing on KPM's credibility. During cross-examination by Mr. Marler, KPM acknowledged life with Mr. Marler was not uniformly negative. She testified that she disliked the restrictions and punishments imposed by Mr. Marler, had run away from the Marler residence, and wanted to live with her biological family. She further acknowledged she understood she would not be returned to Mr. Marler's residence if she reported sexual abuse, giving the jury the opportunity to assess her credibility in light of her circumstances.

[¶108] Because the jury had ample information from which to evaluate KPM's credibility and assess Mr. Marler's theory of the case, the exclusion of KPM's misrepresentation to a detention center employee did not deprive the jury of relevant information necessary to assess her reliability, nor was it an abuse of discretion. Accordingly, we find no error in the district court's ruling.

III.    **The district court did not abuse its discretion when it denied defense counsel's request to play the entirety of Mr. Marler's 2016 interview with law enforcement.**

[¶109] Mr. Marler argues the district court abused its discretion when it allowed the State to play excerpts totaling about five minutes from a 2016 recorded interview between Mr. Marler and law enforcement but then did not allow Mr. Marler to introduce the entire sixty-five minute interview to the jury. Mr. Marler argues this violated W.R.E. 106, also known as the rule of completeness.

[¶110] Rulings on the admissibility of evidence are within the discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion. *Munda v. State,* 2023 WY 90, ¶ 21, 535 P.3d 523, 528 (Wyo. 2023). Rule 106 states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

W.R.E. 106. However, Rule 106 does not necessarily require admission of an entire statement, writing, or recording. *Counts v. State,* 2012 WY 70, ¶ 14, 277 P.3d 94, 100 (quoting *United States v. Lopez-Medina,* 596 F.3d 716, 735 (10th Cir. 2010)). Instead, "only those portions which are relevant to an issue in the case and necessary to clarify or explain the portion already received need to be admitted." *Id.* In order to determine whether to admit a disputed portion of a statement, the district court should consider four factors: (1) whether the statement explains the admitted evidence; (2) whether the statement places the admitted evidence in context; (3) whether the statement avoids misleading the jury; and (4) whether the statement insures fair and impartial understanding of the evidence. *Id.*

[¶111] Here, the State played four excerpts from the 2016 interview of Mr. Marler by Sergeant Courtney. In the interview, Sergeant Courtney asked Mr. Marler about hitting AW with a broom handle, and Mr. Marler answered he did not recall hitting the child. The State asked the detective what he noticed about Mr. Marler's speech pattern, which was objected to, with the objection then sustained by the court. Sergeant Courtney then generally testified that during interviews, he listens for speech patterns that might "indicate hesitation" or "struggling with a response." In the remaining clips, Mr. Marler denied any sexual contact with AW and volunteered a story about praying with AW.

[¶112] At the beginning of cross examination, defense counsel asked to approach the bench and then requested to play the entire interview in front of the jury "out of the rule of completeness." Counsel argued, "it would be fair to the jury to hear the entire interview and hear Mr. Marler's demeanor and whether or not he is evasive or hesitant in all these other issues." *Id.* The court declined to allow the entire interview to be played, but stated defense counsel could ask Sergeant Courtney about Mr. Marler's speech during the rest of the interview.

26

[¶113] Fatal to Mr. Marler's claim on appeal is that he did not make an offer of proof following the denial of his request to play the entire sixty-five minute interview at trial.

> In the context of evidentiary rulings at trial, this Court has long adhered to the doctrine that a sufficient offer of proof is necessary so that this Court may be adequately apprised of the nature of the excluded testimony. The dual purpose of this requirement is to enable the trial court to be fully advised in the exercise of its discretion regarding the admission of evidence and to enable the reviewing court to determine if prejudicial error resulted from the exclusion of the proffered testimony.

*Rudolph v. State*, 829 P.2d 269, 274 (Wyo. 1992) (quoting *Krucheck v. State,* 702 P.2d 1267, 1272 (Wyo. 1985)).

[¶114] There is "only one prudent way for an offer of proof to be made at trial. The attorney who seeks to offer evidence which has been refused or to which an objection has been upheld should take the initiative. The offer of proof should then take the form of counsel eliciting the proposed testimony directly from the witness, or entering the tangible evidence in the record, all outside the hearing of the jury." *Id.* Here, Mr. Marler failed to enter the complete recording into evidence and it is not part of the record on appeal.

[¶115] Without an offer of proof, we will not speculate about what the evidence would have shown. The failure to make an offer of proof, "stripped the district court's ability to reconsider its exclusion of evidence at an appropriate time during trial, and it now inhibits meaningful appellate review of the district court's action." *Silva v. State,* 2012 WY 37, ¶ 21, 271 P.3d 443, 450 (Wyo. 2012). "Indeed, [failure] to make an offer of proof must result in a waiver of [the] ability to attribute error to the district court." *Id.* (citing *Padilla v. State,* 601 P.3d 189, 194 (Wyo. 1979)).

### IV. The State did not commit prosecutorial misconduct by impermissibly eliciting certain testimony from AW.

[¶116] Mr. Marler next argues the State committed prosecutorial misconduct when it questioned AW about her father's suicide, claiming the line of questioning was intended to inflame the passions of the jury and to cast AW in a more favorable light.

[¶117] During trial, the following colloquy occurred between the prosecutor and AW:

Q: Shifting gears just a little bit. Before you got to the Marlers, had your father passed away?
A: Yes.

27

Q: Were you still dealing with the emotions of your father's passing at – when you were with the Marlers?
A: To a degree, yes.
Q: Were you – did Mr. Marler ever console you about them?
A: No.
Q: Would he ever go into your room and console you about them?
A: No. I did not talk about my father's passing with anybody.
Q. You didn't talk with anyone in the home about your father's passing?
A. No.
Q. Okay. Did he ever pray with you?
A. Praying was a constant thing in the household for everybody, it wasn't just me individually.
Q. Did he ever pray with you in your bedroom?
B. No.
Q: When did you become aware of your father's suicide?
A: I wasn't aware that it was a suicide until I was in my early teenage years.
Q: Around 12, 13?
A: Yes.
Q: Okay. How were you told about your father's suicide?
A: It was a thing that had been brought up in family therapy at the time, and my mom had finally told us what had really happened. We just knew that my dad had passed away, and we were never told the specifics of how.

[¶118]  Mr. Marler bears the burden of establishing prosecutorial misconduct.  Because he did not object to these questions and answers at trial, we review for plain error.  *Lott v. State,* 2022 WY 143, ¶ 10, 519 P.3d 646, 649 (Wyo. 2022).  Under plain error review, Mr. Marler must show "(1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice."  *Id.* (quoting *Mendoza v. State*, 2021 WY 127, ¶ 12, 498 P.3d 82, 85 (Wyo. 2021)).  Failure to establish any one of the elements precludes a finding of plain error.  *Id.* (quoting *Klingbeil v. State*, 2021 WY 89, ¶ 40, 492 P.3d 279, 288 (Wyo. 2021)).

[¶119]  "Prosecutorial misconduct occurs when a prosecutor illegally or improperly attempts to persuade a jury to wrongly convict a defendant or assess an unjustified punishment."  *Lott,* ¶ 10, 519 P.3d at 649 (quoting *Armajo v. State,* 2020 WY 153, ¶ 32, 478 P.3d 184, 193 (Wyo. 2020)).  A prosecutor's actions constitute misconduct only if they rise to the level of "gross prosecutorial improprieties that have deprived a criminal defendant to his or her right to a fair trial."  *King v. State*, 2023 WY 36, ¶ 16, 527 P.3d 1229, 1238 (Wyo. 2023) (citation omitted).  Misconduct occurs when a prosecutor asks legally objectionable questions or knowingly uses inadmissible evidence.  *Adams v. State,* 2023 WY 85, ¶ 16, 543 P.3d 469, 474 (Wyo. 2023) (citing *Bogard v. State,* 2019 WY 96, ¶ 51, 449 P.3d 315, 327 (Wyo. 2019)).

28

[¶120] The first element of plain error review is satisfied, because the exchange clearly appears in the record. To satisfy the second prong of plain error, Mr. Marler must show the violation of a clear and unequivocal rule of law was transgressed in a clear and obvious, not merely arguable, way. *Anderson,* ¶ 36, 517 P.3d at 593 (citation omitted).

[¶121] "Remarks and evidence that tend to inflame the passions or prejudices of a jury cross the line separating fact from emotion, and such material causes us to carefully scrutinize the record for prosecutorial error." *Berry v. State,* 2023 WY 75, ¶ 50, 533 P.3d 474, 488-89 (Wyo. 2023) (quoting *Solis v. State,* 2013 WY 152, ¶ 50, 315 P.3d 622, 633 (Wyo. 2013)). Mr. Marler's sole argument is that the prosecutor's line of questioning served to "inflame the passions of the jury by making AW a more sympathetic witness." We disagree.

[¶122] The challenged line of questioning toward AW was very brief and served a legitimate evidentiary purpose. Mr. Marler's theory of defense was that the victims fabricated their allegations because they wanted to leave his house and return to their biological families. In response, the prosecutor was entitled to provide factual background regarding the alleged victims' family circumstances and emotional condition when they came to live with Mr. Marler. The testimony established that AW continued to process her father's death and later learned, through family therapy, it had been a suicide.

[¶123] The prosecutor did not dwell on this line of questioning or elicit details concerning the circumstances of her father's death. Rather, the testimony was limited to background information and lacked emotional content typically associated with improper appeals to juror sympathy. *See, e.g., Sam v. State,* 2017 WY 98, ¶¶ 62-63, 401 P.3d 834, 855 (Wyo. 2017) (finding comment stating the jury was "now the voice of the victim" was improper); *see also Solis*, ¶ 50, 315 P.3d at 633 ("Remarks and evidence that tend to inflame the passions or prejudices of a jury cross the line separating fact from emotion …"). Moreover, the jury already knew AW was a foster child placed with Mr. Marler and had also heard evidence concerning the sexual abuse she alleged Mr. Marler inflicted on her.

[¶124] The prosecutor's line of questioning did not transgress a clear and unequivocal rule of law. Even assuming the questioning was of no or only marginal relevance, Mr. Marler cannot demonstrate prejudice. The jury acquitted him of the sexual assault charges involving AW, which undermines his claim the jury was improperly swayed by sympathy for her, or that the prosecutor's questions affected the verdict. Accordingly, Mr. Marler has failed to establish plain error, and thus his claim of prosecutorial misconduct fails.

## V.    Cumulative error did not deprive Mr. Marler of a fair trial.

[¶125] Mr. Marler claims that the cumulative effect of errors deprived him of a fair trial, and that this Court must look at the errors in the context of the entire record. When performing a cumulative error analysis, "we consider only matters that were determined to

be errors, and not any matter assigned as error but determined not to be erroneous." *Hicks v. State,* 2021 WY 2, ¶ 40, 478 P.3d 652, 663 (Wyo. 2021) (quoting *Sweet v. State,* 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010)). Because Mr. Marler has failed to establish any error, we do not consider his cumulative error argument.

## CONCLUSION

[¶126] The district court did not err in finding Rule 404(b) evidence was admissible and not cumulative or unfairly prejudicial. It also did not abuse its discretion when it did not allow defense counsel to question a witness about untruthfulness. Mr. Marler's counsel failed to make an offer of proof related to his request to play the entire audio of an interview of Mr. Marler, thereby waiving his claim of error. Finally, the State did not engage in prosecutorial misconduct when it briefly questioned a victim about her father's death.

[¶127] Affirmed.